T.C. Summary Opinion 2009-48


UNITED STATES TAX COURT


FEDOR RATNIKOV, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 3770-07S.              Filed March 30, 2009.


Fedor Ratnikov, pro se.

<u>Justin D. Scheid</u>, for respondent.


GOLDBERG, <u>Special Trial Judge</u>:  This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect at the time the petition was filed.  Pursuant to section 7463(b), the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.  Unless otherwise indicated, subsequent section references are to the Internal Revenue Code in effect for

the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The sole issue for decision is whether salary payments petitioner received during 2003 and 2004 from Rutgers University are exempt from Federal income tax under the Convention for the Avoidance of Double Taxation, U.S.-Russ., June 17, 1992, 3 Tax Treaties (CCH) par. 8003 (treaty).

## Background

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioner resided in Illinois when he filed his petition.

For at least three decades, Rutgers, the State University of New Jersey (Rutgers), has received grants from the National Science Foundation (NSF) and has contributed its own funds to send personnel, predominantly faculty and students, to conduct research in elementary particle physics at Fermi National Accelerator Laboratory (Fermilab), near Batavia, Illinois, close to Chicago. A significant feature of Fermilab is the Tevatron, a powerful particle accelerator 4 miles in circumference.

On October 31, 1999, at the invitation of Rutgers, petitioner, a citizen of the Russian Federation, entered the United States under exchange visitor status on a J-1 visa. Petitioner's entrance document from the United States Information

Agency shows that he was joining an existing Rutgers research program as a postdoctoral research scholar in the area of high-energy experimental physics "to promote the general interests of international education and cultural exchange". The document signed by the associate director of Rutgers's Center for International Faculty and Student Services notes that Rutgers agreed to pay petitioner $46,000 for the first year of research, November 1, 1999, to October 31, 2000, and that petitioner had not secured funding from any other source.

Petitioner promptly began conducting research for Rutgers at Fermilab and settled nearby. One year later petitioner's wife joined him in the United States, and she began working directly for Fermilab. Throughout the years at issue they continued to reside in Illinois and continued to work at Fermilab. In May 2005 petitioner began employment with the University of Maryland, College Park. However, he continued to reside near and conduct research at Fermilab.

Rutgers maintained petitioner's appointments at Fermilab through annual 1-year employment contracts. In a letter dated July 16, 2002, Rutgers's dean of educational initiatives offered to hire petitioner for November 1, 2002 through October 31, 2003, at the rank of research associate in the Department of Physics and Astronomy, in the Faculty of Arts and Sciences. The letter states that Rutgers's hiring "is a grant-funded appointment

contingent on the availability of funds to support it".  The dean enclosed with the letter a copy of Rutgers's "Faculty Employment Agreement" for petitioner to sign.  Petitioner had no teaching responsibilities.  Rutgers provided petitioner with its standard vacation, sick leave, and retirement benefits.

Rutgers's grant proposal to NSF for the 3-year period starting October 1, 2003, consisted of four main ongoing projects and the completion of two earlier projects.  However, because of NSF streamlining of proposal requirements, Rutgers combined the projects into one broad proposal entitled "Experimental Research In Elementary Particle Physics".  Rutgers requested a total of $5,035,044 from NSF, based on annual requests of $1,465,447, $1,757,599, and $1,811,998.  The proposal noted that Rutgers's science faculty had requested their university to contribute about $50,000 per year of its own funds to directly support the projects.

Rutgers's proposal listed 11 senior physicists as leading its overall research effort, of which petitioner was not one. Rutgers's four main projects were:  (1) The observation of the highest-energy cosmic rays with the Fly's Eye detector, (2) operation and upgrade of the CDF (collider detector at Fermilab), (3) preparation of the CMS (Compact Muon Solenoid) for future operation at CERN (acronym for Conseil Européen pour la Recherche Nucléaire (European Organization for Nuclear Research), and (4)

preparation of "chemical-vapor-deposition diamond detectors" for the CMS.

Although petitioner was not one of the 11 senior physicists, Rutgers did list him in the technical detail section of the second main project, the CDF operation and upgrade.  The detail listed, in apparently the order of responsibility, seven senior physicists, one professional staff member, five doctoral researchers (including petitioner), four graduate students, and three undergraduate summer students.  The detail further highlighted five "Rutgers senior personnel [who] are key members of the leadership of the CDF Collaboration", including petitioner, as follows:  "Postdoc Fedor Ratnikov heads the Tau Working Group in CDF, and has written the backbone of the tau finding and triggering code for the experiment."  The CDF project incorporated collaboration from about 300 physicists from around the world.

Specifically, petitioner was responsible for leading a group of about 10 people who were supporting the data handling for the tau particles reconstruction experiment.  This group made it possible for the experiment to store petabytes of data. Petitioner reported to Dr. Terence Watts, the head of the Rutgers CDF data handling group, who was based in New Brunswick, New Jersey.  But petitioner exercised independent discretion day to day, and he presented findings at international conferences:

Beijing in 2001, San Diego in 2003, and Samar, the Philippines in 2004.

Rutgers paid petitioner biweekly. For 2003 and 2004 Rutgers issued petitioner Forms W-2, Wage and Tax Statement, reporting that petitioner had Federal taxable "Wages, tips, other compensation" of $47,672.15 and $51,674.04, respectively.

Before preparing his 1999 Federal income tax return, petitioner consulted a certified public accountant (C.P.A.) recommended by his colleagues. The C.P.A. advised petitioner that the treaty exempted petitioner's first 5 years of income from Federal income tax because petitioner was receiving the payments from a governmental, scientific, or educational organization and not from a private source.

On the C.P.A.'s advice petitioner filed his 1999 through 2004 tax returns excluding the Rutgers payments from income. For 2003 petitioner filed a Form 1040NR-EZ, U.S. Income Tax Return for Certain Nonresident Aliens With No Dependents, reporting his filing status as married filing separate and $47,672.15 in nontaxable salary, resulting in an overpayment equal to his withholdings of $7,899.76. Petitioner reported no other income, deductions, allowances, or credits. On page 2 of the form petitioner fully disclosed that he was from Russia, the purpose of his visit was research in high-energy physics, he had filed a 2002 Form 1040NR-EZ, his income was exempt from Federal income

tax under article 18, paragraph 1(c), of the treaty, and he was not subject to income tax in Russia for the income he was excluding in the United States.

Petitioner reported the 2004 payments from Rutgers in a similar manner. He filed a 2004 Form 1040NR-EZ, reporting $43,061 as nontaxable wages. The only material difference from 2003 was that for 2004 petitioner reported $8,613.04 in taxable wages, which represented the final 2 months of the 2004 payments because petitioner calculated that the 5-year exemption under the treaty ended on October 31, 2004. After subtracting a personal exemption of $3,100, petitioner computed a tax of $553 and netted the tax against his withholdings of $8,501.73, yielding an overpayment of $7,948.73.

In 2006 the IRS examined petitioner's 2003 and 2004 tax returns. The examiner determined that petitioner should have reported all of his salary from Rutgers as taxable wages. On the basis of the examiner's findings, the IRS issued a notice of deficiency dated November 14, 2006, determining deficiencies in income taxes of $7,966 and $8,328 for 2003 and 2004, respectively. Petitioner timely petitioned this Court seeking redetermination of the deficiencies.

Concurrently, the IRS issued a notice of deficiency to petitioner's wife pertaining to her 2003 and 2004 tax returns, in which she had similarly excluded her income from Fermilab because

of the treaty and filed using married filing separate status.
The IRS again maintained its position that the treaty did not
exclude her wages from Federal income tax and issued a notice of
deficiency.  Petitioner's wife also timely petitioned the Court
for redetermination of the deficiencies.

Petitioner and his wife sent their petitions to the Court in
one envelope.  The Court assigned docket No. 3770-07S to
petitioner's petition and docket No. 3771-07S to his wife's
petition.

Subsequently, petitioner and his wife established to
respondent's satisfaction that as a couple they were jointly
entitled in 2003 and 2004 to dependency exemptions for their two
children and itemized deductions in the following amounts:

|  | 2003 | 2004 |
| --- | --- | --- |
| Dependency exemptions | $6,100 | $6,200 |
| Real estate taxes | 4,280 | 4,645 |
| Home mortgage interest | 14,609 | 10,952 |
| Contributions | 100 | -0- |

Petitioner also established that he was separately entitled
to deductions in 2003 and 2004 for State income tax that he had
paid in amounts of $1,441.81 and $1,602.77, respectively.
However, section 6013(b)(2)(B) provides a limitation such that
once an individual and his spouse have filed separate returns for
a year, and either spouse has petitioned the Court after

receiving a notice of deficiency from the Commissioner, then the spouses are precluded from filing a joint return for that year.

The Court heard petitioner's case at a trial session in Chicago.  The Court did not hear petitioner's wife's case, which was set for trial on the same calendar, because she and respondent had reached a settlement agreement before trial.  On March 4, 2008, the Court entered an agreed decision in the petitioner's wife's case at docket No. 3771-07S.  Apparently, the settlement provided that the petitioner's wife's wages from Fermilab were taxable as income to her, she was entitled to all of the dependency exemptions for the two children for 2003 and 2004, and she was entitled to one-half of the above-mentioned "joint" itemized deductions.

Accordingly, with respect to the exemptions and deductions for petitioner's case, the Court ordered respondent and petitioner to enter into a supplemental stipulation of facts, which the Court filed on March 13, 2008.  The supplemental stipulation provided that petitioner is entitled to the following amounts:

|  | 2003 | 2004 |
|---|---|---|
| Dependency exemptions | -0- | -0- |
| Personal exemption | $3,050.00 | $3,100.00 |
| Real estate taxes | 2,140.00 | 2,322.50 |
| Home mortgage interest | 7,304.50 | 5,476.00 |
| Contributions | 50.00 | -0- |
| State income tax | 1,441.81 | 1,602.77 |

Consequently, at trial respondent requested that the Court enter its decision under Rule 155 to take into account petitioner's entitlement to personal exemptions and itemized deductions listed above.

## Discussion

In general, the Commissioner's determination set forth in a notice of deficiency is presumed correct, and the taxpayer bears the burden of showing that the determination is in error. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). Under section 7491(a), the burden regarding factual matters may shift to the Commissioner if the taxpayer produces credible evidence and meets the other requirements of the section. Petitioner did not argue for a burden shift, and therefore the burden remains with him.

The role of the judiciary in interpreting tax treaty provisions is to decide their underlying intent or purpose. Estate of Silver v. Commissioner, 120 T.C. 430, 434 (2003); N.W. Life Assurance Co. of Can. v. Commissioner, 107 T.C. 363, 378-379 (1996). We therefore begin our analysis by examining the treaty itself. The pertinent part of article 18, Students, Trainees and Researchers, provides as follows:

> 1. An individual who is a resident of a Contracting State at the beginning of his visit to the other Contracting State and who is temporarily present in that other State for the primary purpose of:
>
>     \*     \*     \*     \*     \*     \*     \*

c) studying or doing research as a recipient of a grant, allowance, or other similar payments from a governmental, religious, charitable, scientific, literary, or educational organization,

shall be exempt from tax by that other State with respect to payments from abroad for the purpose of his maintenance, education, study, research, or training, and with respect to the grant, allowance, or other similar payments.

2. The exemption in paragraph 1 shall apply only for such period of time as is ordinarily necessary to complete the study, training or research, except that no exemption for training or research shall extend for a period exceeding five years.

3. This Article shall not apply to income from research if such research is undertaken not in the public interest but primarily for the private benefit of a specific person or persons.

[Treaty art. 18, 3 Tax Treaties (CCH) par. 8003, at 163,018.]

Reviewing article 18, we conclude that petitioner satisfies the requirements in that he was a resident of Russia at the beginning of his visit to the United States, he was temporarily present in the United States for the purpose of conducting research, the payments came from a governmental, scientific, or educational organization, and he undertook the research for the public interest and not for private benefit. The sole remaining issue, then, is whether under article 18, paragraph 1(c), petitioner was the "recipient of a grant, allowance, or other similar payments".

In a case with nearly identical facts, the U.S. Court of Federal Claims had to decide whether Mr. Sarkisov, a Russian

citizen, was "doing research as a recipient of a grant" according to the meaning and application of that phrase as it appears in the treaty. Sarkisov v. United States, 95 AFTR 2d 2005-738, 2005-1 USTC par. 50,218 (Fed. Cl. 2005). Mr. Sarkisov had entered the United States in 1998 from Russia on a temporary basis on a J-1 visa to conduct research in physics (optics spectroscopy) for the University of Nevada. Id. at 2005-739, 2005-1 USTC par. 50,218, at 87,478. On the entrance document Mr. Sarkisov stated that he had financial support from no other sponsor. Id. The University of Nevada's funding for the project came from several grants, including grants from Cornell University, the Department of Energy, and the U.S. Navy. Id. at 2005-740, 2005-1 USTC par. 50,218, at 87,479. Mr. Sarkisov was not a direct recipient of any of the grants, and none of the grants specified that the funding depended on the university's continued employment of Mr. Sarkisov. Id. The university paid Mr. Sarkisov a salary and withheld Federal income tax. Id. at 2005-739, 2005-1 USTC par. 50,218, at 87,478. Mr. Sarkisov filed refund claims for 1998 through 2000 which the IRS denied. Id. Mr. Sarkisov then commenced an action against the United States in the Court of Federal Claims for refunds, contending that the salary payments were exempt under the treaty as grants for research pursuant to article 18(1)(c). Id.

In granting summary judgment in favor of the United States, the Court of Federal Claims, while acknowledging that Mr.

Sarkisov met the basic requirements of the treaty, held that his salary from the University of Nevada was not exempt from Federal income tax as a grant for the following reasons. First, the record was replete with references to Mr. Sarkisov as an employee of the university, but the record contained no references to Mr. Sarkisov as a grant recipient. Id. at 2005-741, 2005-1 USTC par. 50,218, at 87,479. Although Mr. Sarkisov's employment contract emphasized that the university made his hiring contingent on the university's receiving grant funding, the court found that the university incorporated the contingency into the contract simply to protect itself against a shortfall of funds for research, which in no manner converted Mr. Sarkisov's salary into a grant. Id. Second, although Mr. Sarkisov argued that in the modern environment grantors make grants to universities, not to individuals, the court held that treaty terms are matters for contracting states to address, not the judiciary. Id. Third, the term "grant" carries a special meaning, and the court concluded that it would create "unintended benefits to parties outside the scope of the Treaty's language" to interpret the term so broadly as to incorporate all payments to researchers, including a monthly salary, as a grant. Id. at 2005-740 through 2005-741, 2005-1 USTC par. 50,218, at 87,479.

Now we compare the facts in petitioner's case with those in Sarkisov v. Commissioner, supra. First, many documents in the record such as the Faculty Employment Agreement and the Forms W-2

refer to petitioner as an employee receiving a salary. The 3-year Rutgers grant proposal of about 30 pages mentions petitioner only briefly as leading one of the subprojects, never as leading one of the main projects, and not as a senior physicist. We believe petitioner and his colleagues when they say petitioner performed well and that Rutgers could not have proceeded on the CDF data-handling without his participation. Petitioner led a team of 10 people and gave international presentations. However, he reported to another physicist who Rutgers listed as one of the senior physicists on the CDF project. Similarly, the Court received into evidence annual NSF grant approval letters for 2000-04 citing the names of other Rutgers physicists but not petitioner. Further and importantly, petitioner himself acknowledged that without his presence Rutgers's other NSF projects would have continued and Rutgers might have substituted a different subproject in its grant request. In summary, we find first that Rutgers conditioned petitioner's employment on Rutgers's receipt of funding from the NSF, but critically, Rutgers's NSF funding was not contingent on petitioner's participation.

Second, if the modern funding environment has shifted to providing grants to universities instead of to individuals, we agree with the Court of Federal Claims that the contracting states have the responsibility to modify their treaty terms if they choose, not the judiciary.

Third, in accord with the Court of Federal Claims, we too recognize that the term "grant" has a precise meaning.  We likewise hold that it would be overly broad to construe all payments for research as a grant.

In summary, we hold that petitioner was not the recipient of "a grant, allowance, or other similar payments" under article 18, paragraph 1(c) of the treaty between the United States and the Russian Federation.  As a result, the salary that petitioner received during 2003 and 2004 from Rutgers is includable in income.

To reflect our disposition of the issues,

<u>Decision will be entered</u>

<u>under Rule 155</u>.