T.C. Summary Opinion 2010-168

UNITED STATES TAX COURT

PATROCINIO POBADORA MALAZARTE, JR., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 16393-09S.                    Filed November 3, 2010.

Leonardo A. Conseco, for petitioner.

Jonathan Hauck and Tyler N. Orlowski, for respondent.

GOLDBERG, Special Trial Judge:  This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect at the time the petition was filed.  Pursuant to section 7463(b), the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.  Unless otherwise indicated, subsequent section references are to the Internal Revenue Code (Code) in

effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Respondent determined deficiencies in petitioner's Federal income taxes of $3,164 and $10,376, and section 6662(a) accuracy-related penalties of $633 and $2,075, for 2005 and 2006, respectively.  After concessions,[1] the issues for decision are whether petitioner's salary for 2005 and 2006 from the Baltimore County, Maryland, Public Schools (BCPS) is exempt from Federal income tax under the Convention With Respect to Taxes on Income, U.S.-Phil., art. 21, Oct. 1, 1976, 34 U.S.T. 1277 (article 21); (2) whether petitioner is entitled to certain itemized deductions for 2006; and (3) whether petitioner is liable for the accuracy-related penalties under section 6662(a) for each of the 2 years at issue.

## Background

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.  Petitioner resided in Maryland when he filed his petition.

Petitioner is a citizen of the Republic of the Philippines. In 2005 petitioner was married and had three children and owned a

---

[1]Respondent's notice of deficiency determined that petitioner failed to include a $650 State income tax refund and $12 of interest income in his 2006 gross income.  Petitioner did not address these issues in his petition or at trial; therefore, the issues are deemed conceded.  See Rules 34(b), 149(b).

home in the Philippines. He received a bachelor's degree in political science from the University of San Jose-Recoletos. He received a master's degree in education from the University of San Carlos and a master's degree in teaching with a specialization in special education from the University of the Visayas. Petitioner also finished all of the academic requirements for a doctorate in education at Cebu Normal University (Cebu Normal). All of the institutions petitioner attended are in the Philippines. Petitioner has 17 years of teaching experience in the Philippines, 10 years at private high schools and 7 at Cebu Normal. His ending monthly salary at Cebu Normal was 14,000 pesos, equivalent to $250.

Amity Institute (Amity) is a nonprofit organization the Department of State (State Department) approved to operate an exchange teacher program. The exchange teacher program allows qualified foreign teachers to enter the United States to teach for up to 3 years. Amity does not directly recruit teachers from the Philippines. During 2004 and 2005 Amity worked with Badilla Corp. (Badilla), a business entity from the Philippines, and with Avenida & Associates, Inc. (Avenida), a business entity from the United States. Badilla and Avenida are affiliated entities that worked together to facilitate the placement of qualified Filipino teachers in American schools. Badilla collected background information such as transcripts and résumés from teachers in the

Philippines who were interested in the exchange teacher program in the United States. Badilla found its prospective Filipino teachers principally by word of mouth and seminars conducted by its executives. Avenida or Badilla charged placement fees and additional charges to help teaching candidates with, among other tasks, finding employers in the United States. The fees were: A $3,200 placement fee, a $725 U.S. documentation fee, a $500 J-1 visa fee, and $775 for airfare and travel. In the United States Avenida helped school districts find promising teaching candidates by providing access to a database of overseas jobseekers. In 2004 petitioner attended an orientation session for an exchange teacher program Badilla sponsored, at which time he submitted his application and résumé.

Dr. Donald A. Peccia joined BCPS in October 2004 as the assistant superintendent of human resources, a position he retained through the date of trial. As of the date of trial, Dr. Peccia's department employed 71 people who were responsible for the recruitment, retention, and rewarding of the school system's 17,000 full-time and thousands of part-time and temporary employees, working in over 170 schools.

To meet a shortfall in teachers, Dr. Peccia initiated the idea of BCPS' recruiting internationally, beginning with a small "pilot-type program" in the Philippines. In a letter dated January 28, 2005, Dr. Peccia contacted Avenida stating that BCPS

would like to hire 12 or more qualified Filipino teachers. From a preselected group of Filipino teachers BCPS administrators chose the candidates that the school system wanted to interview.

In March 2005 Herman James and Joyce Reier, personnel officers for BCPS, traveled to the Philippines to interview teaching candidates. On March 10, 2005, Ms. Reier interviewed petitioner. Mr. James and Ms. Reier coordinated with Dr. Peccia, and they agreed to hire 20 teachers from the Philippines. On the same day as petitioner's interview Ms. Reier provided him with a preliminary BCPS contract for the 2005-2006 school year. Petitioner signed the preliminary contract and dated his signature March 10, 2005. Petitioner "understood" that BCPS would be evaluating his performance throughout the school year. If his performance was satisfactory, BCPS would continue his employment for the following school year.

Generally, foreign teachers who want to teach in the United States may obtain one of two types of visas. One is the H-1B visa for working professionals. The second is the J-1 visa for individuals coming to the United States under a cultural exchange program approved by the State Department. The J-1 visa is more convenient for foreign individuals who are new teachers in the United States because the visa timing coincides with the academic school year in the United States.

Badilla referred petitioner to Amity, which in turn sponsored petitioner's J-1 visa.  The State Department authorized Amity to issue Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-1) Status.  The form identifies the visitor; identifies the visa sponsor; briefly describes the exchange program, including the start and end dates; identifies the category of exchange; and states the estimated cost of the exchange program.  The cost of the exchange teacher program was $3,000.  At all relevant times, Gertrude Hermann was Amity's executive director.

Badilla invited petitioner and the other teachers who had received employment offers from BCPS to meet at Badilla's office in the Philippines on June 14, 2005.  At the meeting Badilla provided many completed forms that each teacher needed to sign, including an administrative fee agreement, Amity's exchange teacher program contract, and a Form DS-2019.  The length of time listed on the Form DS-2019 was 3 years, the same length as the exchange teacher program.  Badilla reiterated that BCPS required satisfactory performance to continue employment beyond the first year.  Petitioner signed the forms and returned them to Badilla for processing.

Before leaving the Philippines to teach for BCPS, petitioner obtained a 2-year leave of absence from Cebu Normal effective June 7, 2005, through June 30, 2007.

Petitioner entered the United States on July 29, 2005.  This was the first time he had visited the United States.  After arriving in Baltimore, he signed a standard State-issued Provisional Contract for Conditional or Resident Teacher Certificate Holders (BCPS employment contract), effective beginning August 22, 2005.  The BCPS employment contract was for 1 year, terminating automatically at the end of the 2005-2006 school year.  BCPS assigned petitioner to teach special education at Ridgely Middle School (Ridgely).

Under the exchange teacher program, petitioner's family could not join him in the United States until he received a satisfactory evaluation from BCPS.  Therefore, the earliest petitioner's family could join him was at the end of the 2005-2006 school year.

On August 26, 2005, petitioner signed a 1-year lease with Belvedere Towers effective September 1, 2005, through August 31, 2006.  Upon receiving a satisfactory evaluation, petitioner brought his family to the United States in the summer of 2006 to live with him.  Petitioner then signed a second 1-year lease[2] with Southern Management Corp. effective September 14, 2006.

BCPS offered a "Regular Contract" to petitioner effective August 22, 2006, granting him continued employment from year to

---

[2]The lease states that it is a 1-year lease but also states Sept. 14, 2006, through Sept. 30, 2007, as the term of the lease.

year so long as he met certain conditions.  Petitioner's signature on the regular contract was not dated.  A regular contract is another standard State-issued contract under which the teacher received tenure after 2 years if the teacher met all the requirements of the State, including satisfactory performance.  Working in the United States provided petitioner with a salary that was considerably greater than the salary he earned in the Philippines, which as described supra page 3 was $250 a month or $3,000 annually.  Petitioner's starting annual salary at BCPS was $63,326.  With respect to Federal income tax withholding, petitioner did not provide BCPS with Form 8233, Exemption From Withholding on Compensation for Independent (and Certain Dependent) Personal Services of a Nonresident Alien Individual.  Consequently, BCPS withheld Federal income tax from petitioner's salary during 2005 and 2006.

Petitioner engaged a certain U.S. enrolled agent, Fred R. Pacheco, to prepare his 2005 and 2006 Federal income tax returns. He filed Form 1040NR, U.S. Nonresident Alien Income Tax Return, for each of the 2 years.  Petitioner did not report his salary from BCPS on either return.

Petitioner claimed itemized deductions of $2,093 and $18,180 for 2005 and 2006, respectively on his Federal income tax returns.  The 2005 itemized deductions consisted solely of State income tax withheld.  The 2006 itemized deductions consisted of

$4,570 in State income tax withheld, $155 in charitable contributions, $13,405 in unreimbursed employee business expenses, and $50 in tax preparation fees.  As a result of the income exclusion, income tax withholding, and itemized deductions, petitioner requested refunds of $5,452 and $11,505 for 2005 and 2006, respectively.

On February 1, 2008, petitioner signed a resignation form from BCPS effective June 2008, writing that the reason was "expiration of 3-year contract w/ BCPS".  Petitioner then accepted an offer to teach in the Prince George's County, Maryland, Public School System (PGCS).  PGCS sponsored petitioner's H-1B visa valid October 8, 2008, through July 31, 2011.  As of the date of trial, he was teaching in PGCS for the 2009-2010 school year.

The Internal Revenue Service (IRS) selected petitioner's 2005 and 2006 Federal income tax returns for examination.  The examining agent sent three questionnaires to petitioner:  Form 8784, Questionnaire - Temporary Living Expenses; Form 9210, Alien Status Questionnaire; and Form 9250, Questionnaire - Tax Treaty Benefits.  Petitioner completed the forms, dated his signature October 6, 2008, and returned them to the IRS.

The Court received into evidence copies of the three questionnaires that petitioner had completed.  On Form 8784 petitioner wrote that he left his permanent residence on July 29,

2005, and that he planned stay at temporary lodging for 3 years. Petitioner answered that he did not change his original intention about the length of his stay. Petitioner also answered that he was not on a leave of absence from his employer. On Form 9210 petitioner wrote that July 29, 2005, was his date of initial arrival, that at that time he expected to remain in the United States for 3 years, and that this expectation had not changed. On Form 9250, petitioner stated that he was still living in the United States, and that he intended to remain "N/A".

In the notice of deficiency dated April 2, 2009, the IRS adjusted petitioner's income to include the earnings from BCPS for 2005 and 2006 that petitioner had excluded under article 21. The notice also disallowed $13,405 of the $18,180 itemized deductions that he claimed for 2006. The disallowed deductions were labeled job search costs and consisted of $3,066 for rent, $1,724 for transportation, $1,040 for airfare, $6,133 for "agency fee (recruiter)", and $1,442 for "2005 State Refund not Received". Petitioner filed his petition contesting all of respondent's adjustments.

Respondent moved under Rule 121 for partial summary judgment contending that no issue of material fact existed as to whether petitioner's income for the years at issue qualified for exemption under article 21. Petitioner objected to the granting of the motion. Both parties fully briefed the issue of income

exemption under article 21.  The Court set the motion for hearing at trial.  When the case was called for trial, the Court heard the motion.  The parties relied on the respective positions they had set forth in their briefs.  The Court has denied respondent's motion for partial summary judgment.

Shortly before trial, petitioner filed a motion to exclude the testimony of Dr. Peccia on the grounds of hearsay, lack of personal knowledge, and relevance.  Respondent objected to the motion.  The Court heard arguments on the motion at trial and took the motion under advisement.  The Court has denied petitioner's motion.  The case was then tried and the Court heard testimony from petitioner, Dr. Peccia, and Ms. Hermann.

<u>Discussion</u>

I.  <u>Income Under Article 21</u>

Petitioner was a nonresident alien for the years at issue because of his J-1 visa status and his participation in the exchange teacher program.  See sec. 7701(b).  In particular, section 7701(b)(1)(B) provides that a nonresident alien is a person who is not a citizen or resident of the United States within the meaning of section 7701(b)(1)(A).[3]  Generally, a nonresident alien individual engaged in trade or business within

---

[3]As a teacher, petitioner is considered an exempt individual and, therefore, not treated as present for purposes of the substantial presence test.  See sec. 7701(b)(1)(A)(ii), (3)(D)(i), (5)(A)(ii).

the United States is taxed on the taxable income effectively connected with that trade or business. Sec. 871(b). The phrase "trade or business within the United States" generally includes the performance of personal services within the United States at any time within the taxable year. Sec. 864(b). Compensation paid to a nonresident alien in exchange for the performance of services in the United States constitutes income that is effectively connected with the conduct of trade or business in the United States. Sec. 1.864-4(c)(6)(ii), Income Tax Regs. Consequently, petitioner's wages would ordinarily be included in gross income under the Code. Section 894(a), however, provides that the provisions of the Code will be applied to any taxpayer with due regard to any treaty obligations of the United States that apply to the taxpayer. Therefore, the treatment of petitioner's wages might be altered by applicable treaty provisions. See id.

The United States is a party to an income tax convention with the Republic of the Philippines. The convention provides an exemption from U.S. income taxation on income earned by Filipino teachers teaching in the United States if the requirements of the convention are satisfied. Article 21 states:

Article 21
TEACHERS

(1) Where a resident of one of the Contracting States is invited by the Government of the other Contracting State, a political subdivision or local

authority thereof, or by a university or other recognized educational institution in that other Contracting State to come to that other Contracting State for a period not expected to exceed 2 years for the purpose of teaching or engaging in research, or both, at a university or other recognized educational institution and such resident comes to that other Contracting State primarily for such purpose, his income from personal services for teaching or research at such university or educational institution shall be exempt from tax by that other Contracting State for a period not exceeding 2 years from the date of his arrival in that other Contracting State.

To qualify for the exemption under article 21, a taxpayer must meet the following requirements: (1) The taxpayer was a resident of the Philippines before coming to the United States; (2) he was invited by the Government or a recognized educational institution within the United States; (3) he was invited for a period not expected to exceed 2 years; (4) the purpose of the invitation was for him to teach or engage in research at the recognized educational institution; and (5) he did in fact come to the United States primarily to carry out the purpose of the invitation. The taxpayer must meet all of the requirements to qualify for the income exemption.

The only requirement in dispute is whether petitioner's invitation to teach in the United States was "for a period not expected to exceed 2 years". The text of article 21 does not specifically state whose expectation controls the length of the invitation to teach for a period not to exceed 2 years. Petitioner argues that his expectation as the invitee is the only

expectation that matters.  Petitioner testified that "I expected to stay here for the minimum of one year because that's the contract that I signed with BCPS, Ms. Ryer [sic], and the most would be two years because I was informed during [the] interview that BCPS would provide [a] two-year probationary period to the teachers".  Respondent counters that either the expectation of the invitor, BCPS, should be decisive, or the Court should weigh the expectations of all the parties associated with the exchange teacher program.  In the light of this ambiguity in the text of article 21, we will consider all the relevant facts and circumstances, including the expectations of all the parties. See Santos v. Commissioner, 135 T.C. __, __ (2010) (slip op. at 17).  We will construe article 21 liberally.  See N.W. Life Assurance Co. of Can. v. Commissioner, 107 T.C. 363, 378 (1996). Then we will make an objective determination of whether petitioner was invited to the United States "for a period not expected to exceed 2 years".  See Santos v. Commissioner, supra.

A.  Burden of Proof

Generally, the Commissioner's determination of a deficiency is presumed correct, and the taxpayer bears the burden of proving that the deficiency is incorrect.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Furthermore, any deductions allowed are a matter of legislative grace, and the taxpayer bears the burden of proving his entitlement to them.  Rule 142(a);

INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).

Under section 7491(a) the burden may shift to the Commissioner regarding factual matters affecting a taxpayer's liability for tax if the taxpayer produces credible evidence and meets other requirements of the section.  In his pretrial memorandum, petitioner mentioned that he would move for a burden shift under section 7491(a), contending that he had produced credible evidence and met the other requirements of the section. At trial, petitioner did not make an oral or written motion for a burden shift.

We need not, and we explicitly do not, decide which party bears the burden of proof because as discussed above, applying Santos v. Commissioner, supra, we will decide this case on an objective consideration of all the relevant facts and circumstances.

B.  Analysis

We begin our analysis with a discussion of the evidence that relates to petitioner's expectation.  Petitioner's reliance on the two 1-year apartment leases and the 1-year BCPS employment contract is unconvincing.  One-year apartment leases are commonplace and do little to indicate a tenant's long-term expectation to remain in an area.  Likewise, BCPS required all of its first-year teachers to sign the standard State-issued 1-year

employment contract.  The fact that the contract did not guarantee employment beyond the first year does not mean that petitioner expected to stay in the United States for only 1 year.

Likewise, petitioner's reliance on the 2-year probationary period is misplaced.  Petitioner knew that so long as his performance was satisfactory, BCPS would retain him.  Petitioner had a great deal of teaching experience in the Philippines, and when questioned about his job performance, petitioner answered: "I tried my best.  I always put my best into what I am doing." We believe it likely that petitioner had sufficient confidence in his teaching skills to assume that his performance would be "satisfactory" and therefore he could expect that BCPS would employ him for the second and third years of the exchange teacher program.  Furthermore, the exchange teacher program was a 3-year program.

Petitioner also testified that in his mind, the information in his 3-year J-1 visa application that Amity prepared and he signed simply established an upper time limit and did not imply a commitment to stay in the United States for 3 years.  While it is true that this document did not obligate him to remain in the United States for 3 years, we find it particularly hard to believe that petitioner did not expect to remain in the United States for the duration of the exchange teacher program. Bolstering this conclusion are petitioner's own actions and

words.  He brought his family to the United States as soon as the program rules allowed, and he wrote on his resignation form dated June 13, 2008, that the reason he was resigning was the "expiration of 3-contract w/ BCPS", which coincides with the length of the 3-year exchange teacher program.

Petitioner's own words in his answers on the three IRS questionnaires also weigh against him.  His answers show clearly that his initial expectation was to remain in the United States for the entire length of the 3-year exhange teacher program.  Furthermore, petitioner introduced no evidence that he expressed to any of the parties involved that he expected to remain in the United States for 2 years or less.  Similarly, petitioner did not testify that he expected to remain in the United States for 2 years or less.  Thus, petitioner's actions indicate a strong commitment to staying in the United States for 3 years despite the difficulties.

The fact that petitioner obtained a leave of absence is simply not a decisive factor.  Petitioner's request for a leave of absence was a good backup strategy in the event he decided to return to the Philippines, but it does not indicate that he expected to stay in the United States for 2 years or less.

In addition, we cannot ignore the financial incentive of remaining in the United States for as long as possible.  Petitioner and his family incurred significant expenses for him

to participate in the exchange teacher program. These expenditures are not insignificant in comparison to his earnings in the Philippines. Moreover, his earnings immediately grew more than 21-fold from $3,000 to $63,326 when he moved from the Philippines to the United States. Although petitioner testified his cost of living was lower in the Philippines, the increase in salary is too large to ignore.

From the perspective of BCPS, the school system absolutely expected that the Filipino teachers would remain for the length of the 3-year exchange teacher program. Dr. Peccia testified that his department expected the Filipino teachers to remain within the school system for exactly the length of the visa, 3 years. He stated "we had no expectations beyond 3 years and no expectations of less than 3 years." Dr. Peccia explained that "it wouldn't have been worth the investment" including "the cost of the [airline] ticket[s], the cost of all the time people were away". He added that BCPS helped the Filipino teachers with finding housing and with obtaining Social Security cards to ease their physical and psychological transition so that the teachers could focus on teaching. Dr. Peccia noted that only 1 or 2 of the 20 Filipino teachers did not complete the 3-year term. In other words, 90 to 95 percent of the teachers remained in the United States for the full 3 years.

Corroborating this evidence is the testimony of Ms. Hermann, who stated that BCPS, similar to the other school systems that hired foreign teachers through the exchange teacher program, expected the teachers to stay for the entire 3-year program. She added that it had been Amity's experience that only a small percentage of Filipino teachers returned to the Philippines before completing the 3-year teacher exchange program, and most participants decided to remain in the United States beyond the 3 years. As of the date of trial, petitioner remained in the United States teaching in Maryland. The testimony of these two witnesses is plausible, reliable, and persuasive.

In conclusion, after an objective examination of all of the relevant facts and circumstances, we find that petitioner and BCPS expected petitioner to stay in the United States for at least 3 years, which is greater than the "not expected to exceed 2 years" requirement of article 21. Therefore, petitioner's income for June 2005 to June 2007, the first 2 years he was in the United States, is not exempt from Federal income tax under article 21.

II. <u>2006 Disallowed Unreimbursed Employee Expenses--$13,405</u>

Section 162(a) allows a deduction for ordinary and necessary business expenses paid or incurred during the taxable year in carrying on any trade or business. The performance of services as an employee is considered a trade or business for section 162

purposes.  <u>Primuth v. Commissioner</u>, 54 T.C. 374, 377 (1970).  For an expense to be necessary, it must be "appropriate and helpful" to the taxpayer's business.  <u>Welch v. Helvering</u>, 290 U.S. at 113-114.  An expense will be considered ordinary if it is a common or frequent occurrence in the type of business in which the taxpayer is involved.  <u>Deputy v. du Pont</u>, 308 U.S. 488, 495 (1940).  Taxpayers must maintain records sufficient to substantiate any deductions they claim.  Sec. 6001; sec. 1.6001-1(a), Income Tax Regs.  Petitioner's disallowed deductions were all labeled job search costs.

A.    "Agency Fee (Recruiter)"--$6,133, "2005 State Refund not Received"--$1,442, and Airfare--$1,040

Included in the disallowed unreimbursed employee expenses are an "agency fee (recruiter)" of $6,133, a "State Refund not Received" of $1,442, and $1,040 for airfare.  Petitioner's $6,133 for job search costs is a combination of expenses he paid in 2005 and 2006.  He paid $5,200 to Avenida in fees and $1,500 of the $3,000 exchange teacher program fee in 2005.  The exchange teacher fee was paid in increments over the 3-year period of the program.  Petitioner paid $1,500 of the fee during his first year of the program and made two subsequent annual payments of $750, one in the second year of the program and one in the third.  Petitioner had to pay the fees to come to the United States and to continue his participation in the exchange program.

Petitioner did not substantiate his $5,200 in J-1 visa fees in 2005, his $1,500 payment in 2005, or his $750 payment in 2006, but we are satisfied that petitioner paid these fees in 2005 and 2006 to maintain his standing in the program. Although petitioner did not deduct any expenses for 2005 and claimed only $6,133 of expenses for 2006, the record shows that he paid a total of $6,700 in fees to participate in the teacher exchange program in 2005. Therefore, petitioner is entitled to a $6,700 deduction for 2005 and a $750 deduction for 2006.

Petitioner provided no explanation or evidence to support the $1,442 deduction he claimed for "2005 State Refund not Received" for 2006. Therefore, we sustain respondent's disallowance.

Finally, petitioner failed to provide an explanation or provide evidence to support the $1,040 deduction he claimed for airfare for 2006. On Form 9210 petitioner merely states "update my job skills" for the reason for departing from the United States on December 24, 2005. Without further corroboration, petitioner's statement regarding this deduction is too vague for the Court to allow the deduction without further substantiation. Therefore, we sustain respondent's disallowance.

B. Personal Living and Transportation Expenses--$4,790

Respondent also disallowed unreimbursed employee expenses consisting of $3,066 for rent and $1,724 for transportation

between petitioner's apartment and his teaching job at Ridgely. As a general rule, personal living expenses are nondeductible. Sec. 262; secs. 1.162-2(a), 1.262-1(b)(5), Income Tax Regs. Section 162(a)(2), however, allows a taxpayer to deduct ordinary and necessary travel expenses, including meals and lodging, paid or incurred while away from home in pursuit of a trade or business. Commissioner v. Flowers, 326 U.S. 465, 470 (1946).

The reference to "home" in section 162(a)(2) means the taxpayer's "tax home". Mitchell v. Commissioner, 74 T.C. 578, 581 (1980); Kroll v. Commissioner, 49 T.C. 557, 561-562 (1968). As a general rule, a taxpayer's tax home is in the vicinity of his principal place of employment, not where his personal residence is, if different from his principal place of employment. Mitchell v. Commissioner, supra at 581; Kroll v. Commissioner, supra at 561-562. An exception to the general rule exists where a taxpayer accepts temporary, rather than indefinite, employment away from his personal residence; in that case, the taxpayer's personal residence may be his tax home. Peurifoy v. Commissioner, 358 U.S. 59, 60 (1958). The purpose of the exception is to mitigate the burden of the taxpayer who must incur duplicate living expenses because of the exigencies of business. Kroll v. Commissioner, supra at 562. For purposes of section 162(a)(2), the taxpayer is not treated as being

temporarily away from home if the period of employment exceeds 1 year.  Sec. 162(a) (flush language).

Petitioner contends that his employment with BCPS was temporary because the BCPS employment contract he signed was for only 1 year and because at most he would be in the United States for only 2 years because of BCPS' probationary period for new teachers.  He contends that his tax home was in the Philippines, as that was where he resided with his family.  In other words, according to petitioner, his rent and transportation to and from work for 2006 are deductible because he expected to stay in the United States for a minimum of 1 year, the length of the BCPS employment contract, or a maximum of 2 years, the length of the probationary period, and thus, his job was temporary.

Respondent argues that petitioner's employment at BCPS was indefinite and that Baltimore County became his tax home when he moved there to teach beginning August 2005 for BCPS.  For the following reasons, we agree with respondent.

Petitioner took a 2-year leave of absence from his teaching job in the Philippines when he moved to Baltimore County on July 29, 2005.  He began teaching at Ridgely for BCPS in August 2005. Although petitioner testified to owning property in the Philippines, he provided no list of duplicate living expenses. We have already found that petitioner intended to remain in the Baltimore County area for at least 3 years to work for BCPS,

which is clearly more than 1 year or 2 years.  Further, under the flush language of 162(a), petitioner would no longer be considered a temporary employee once he started his second year of teaching for BCPS.  Accordingly, Baltimore County was petitioner's principal place of employment and thus Baltimore County was his tax home.  Consequently, petitioner is not entitled to claim a deduction for his rent, transportation to and from work, or airfare for 2006.

III.  Accuracy-Related Penalty

Taxpayers may be liable for a 20-percent penalty on the portion of an underpayment of tax attributable to negligence, disregard of rules or regulations, or a substantial understatement of income tax.  Sec. 6662(a) and (b)(1) and (2).

The term "negligence" in section 6662(b)(1) includes any failure to make a reasonable attempt to comply with the Code, and the term "disregard" includes any careless, reckless, or intentional disregard.  Sec. 6662(c).  Negligence has also been defined as the failure to exercise due care or the failure to do what a reasonable person would do under the circumstances.  See Allen v. Commissioner, 92 T.C. 1, 12 (1989), affd. 925 F.2d 348, 353 (9th Cir. 1991); Neely v. Commissioner, 85 T.C. 934, 947 (1985).  Negligence also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly.  Sec. 1.6662-3(b)(1), Income Tax Regs.  An

"understatement of income tax" is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A).

The section 6662 accuracy-related penalty does not apply where the taxpayer shows that he acted in good faith and with reasonable cause. Sec. 6664(c)(1). The determination of whether a taxpayer acted in good faith and with reasonable cause depends on the facts and circumstances of each case and includes the knowledge and experience of the taxpayer and the reliance on the advice of a professional, such as an accountant. Sec. 1.6664-4(b)(1), Income Tax Regs. For a taxpayer to rely reasonably upon advice of a tax adviser, the taxpayer must, at a minimum, prove by a preponderance of the evidence that: (1) The adviser was a competent professional with sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir. 2002). Most important in this determination is the extent of the taxpayer's effort to determine the proper tax liability. Id.

The Commissioner has the burden of production under section 7491(c) with respect to the accuracy-related penalty under section 6662. To satisfy that burden, the Commissioner must

produce sufficient evidence showing that it is appropriate to impose the penalty. Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Respondent has satisfied his burden by producing evidence that petitioner reported no teaching income for 2005 and 2006, failed to substantiate claimed deductions, and had a substantial understatement of income tax for 2006.

Nonetheless, petitioner sought the advice of a return preparer for his 2005 and 2006 Forms 1040NR. Petitioner stated that his preparer was an enrolled agent in the United States. Respondent did not dispute the competency of the preparer. The preparer counseled petitioner that his income was exempt from taxation in the United States under article 21. Petitioner, having no formal training in taxation and being new to the U.S. tax system, reasonably relied upon the advice of a competent tax return preparer and acted in good faith. Therefore, we do not sustain respondent's determination that the section 6662 accuracy-related penalty applies for 2005 or 2006.

IV. Conclusion

The Court has considered all arguments made in reaching our decision, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered

under Rule 155.